UNITED STATES BANKRUPTCY COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| In re:<br><br>**ALLIANCE SECURITY, INC.**<br><br>Debtor. | Chapter 11<br>Case No. 17-11190 |

**MOTION FOR ENTRY OF ORDER AUTHORIZING AND APPROVING (I) SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES; (II) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) RELATED RELIEF**

NOW COMES Debtor and Debtor-in-Possession Alliance Security, Inc. (the "Debtor") and pursuant to 11 U.S.C. § 363, Fed. R. Bankr. P. 2002(a)(2) and 6004, and R.I. LBR 6004-1, seeks entry of an order authorizing and approving (1) the sale, free and clear of all liens, claims, interests, and encumbrances, of substantially all of the Debtor's assets; (II) the assumption and assignment of certain executory contracts and unexpired leases; and (III) establish procedures for the Debtor's consummation of the transactions contemplated herein. In support thereof, the Debtor states as follows:

**JURISDICTION AND VENUE**

1.  The Court's exercise of jurisdiction is proper pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1391, 1408, and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter final order on these matters. The predicates for the relief requested herein are §§ 105(a), 363, of 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"); Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and Rhode Island Local Bankruptcy Rule 6004-1.

**BACKGROUND**

2.  The Debtor commenced this case by the filing of a voluntary petition under Chapter

1

11 of the Bankruptcy Code on July 14, 2017. The Debtor continues to operate its business and manage its property as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

3. On July 27, 2017, the U.S. Trustee's office appointed the Official Committee of Unsecured Creditors (the "Committee").

*Debtor's Business Operations*

4. Debtor is a home security business founded in 2003 and owned by majority shareholder Jasjit Gotra, and minority shareholders Brian Fabiano and Ricardo Diaz.

5. Debtor sells, installs and services home and business security systems, including security alarms and cameras, alarm monitoring, smoke and carbon monoxide detectors; and smart home and business devises such as smart light bulbs, plugs, thermostats, door locks and doorbell cameras.

6. The Debtor's assets primarily include, *inter alia*, cash, alarm equipment inventory, alarm monitoring accounts, general intangibles, executory contracts, licenses and permits, vehicles, and office equipment, including hardware and software ("Assets").

7. With respect to its alarm monitoring accounts, following an alarm installation Debtor eventually may, and typically does, sell the alarm monitoring account to a third party alarm services company in exchange for upfront payment of the certain percentage of the future monthly monitoring fees. Debtor also collects monthly monitoring fees for alarm monitoring accounts that it retains, until such time as the alarm monitoring accounts are sold.

8. Debtor's business is based primarily on the sale of the alarm monitoring accounts, and not the revenue derived from the monthly monitoring fees. However, Debtor typically tries to retain alarm monitoring accounts for at least several months so that the account is less likely to be cancelled after its sale by Debtor.

9. Prior to Debtor's bankruptcy filing, Debtor and Monitronics International, Inc. ("Monitronics") were parties to an Alarm Monitoring Purchase Agreement (the "AMPA"), which, *inter alia*, provides a mechanism by which Monitronics could purchase, under various conditions and within Monitronics' discretion as defined in the AMPA and the addendums thereto, any alarm monitoring agreement that the Debtor entered into with a security system customer and desires to sell. The AMPA included a right of first refusal, whereby Monitronics had a right of first refusal with respect to the purchase of Debtor's alarm monitoring agreements. Prior to selling an alarm monitoring agreement to Monitroincs pursuant to the AMPA, Monitronics Security LP handled the alarm monitoring for Debtor's customers pursuant to a Master Contract Monitoring Agreement dated April 22, 2008, and as thereafter amended on July 16, 2010 and May 15, 2012 (the "CMA").

10. However, the terms of the AMPA became overly burdensome on Debtor, and the AMA sale terms under the AMPA were insufficient to allow Debtor to continue its operations and its relationship with Monitronics. Ultimately, the Debtor recognized that it could not effectively operate and attempt to preserve its assets without relief from the AMPA. Accordingly, on July 14, 2017, Debtor filed the instant chapter 11 proceedings.

11. Following Debtor's bankruptcy filing, Debtor rejected the AMPA and subsequently entered into the Dealer Agreement with Safe Home Security, Inc. ("SHS") pursuant to the Order Authorizing Debtor to Enter Into Dealer Agreement (Doc. No. 337) entered by the Bankruptcy Court on December 11, 2017. Debtor also rejected the CMA effective December 28, 2017, pursuant to the Agreed Order Authorizing Debtor's Rejection of Contract Monitoring Agreement Pursuant to 11 U.S.C §§ 365 and Fed. R. Bankr. P. 6006 entered by the Bankruptcy Court on December 4, 2017 (Doc. No. 330). Prior to selling any accounts to SHS, the alarm monitoring services are now provided by SHS or Rapid Response Monitoring, Inc.

12.     Since the end of 2018, Debtor has sought to transition its sales from a telemarketing business to a door-to-door sales business model. Currently, Debtor estimates that 75% of its sales are form door-to-door sales, and only 25% are from telemarketing sales.

*The Federal Trade Commission Litigation*

13.     In April 2014, Debtor and Mr. Gotra entered into a Consent Order (the "2014 Order") with the Federal Trade Commission ("FTC") in the United States District Court for the District of Massachusetts (the "District Court") that, *inter alia*, prohibits Debtor, Gotra "and their Representatives" from "initiating" (i) an unsolicited telemarketing call to a consumer at a telephone number on the National Do-Not-Call-Registry ("NDNCR") or on Debtor's Internal Do-Not-Call-Registry ("IDNCR"); or (ii) an unsolicited telemarketing call that delivers a pre-recorded message (unless certain exceptions apply).

14.     Prior to Debtor's bankruptcy filing, it was the subject of a civil investigation by the FTC into potential violations of the 2014 Order and/or telemarketing and credit reporting laws.

15.     On June 30, 2017, two weeks before Debtor filed bankruptcy, the FTC sent Debtor's prior counsel a draft Complaint and proposed Order to attempt to resolve a settlement prior to initiating litigation. Then, the FTC spent an additional eight months attempting to negotiate a settlement before filing the lawsuit.

16.     Following Debtor's bankruptcy filing, Debtor retained special counsel to represent Debtor in connection with the FTC's investigation and potential litigation regarding Debtor's telemarketing and credit reporting practices. However, the FTC ultimately voted to move forward with filing a lawsuit against Debtor and Mr. Gotra alleging violations of the 2014 Order and/or telemarketing and credit reporting laws.

17.   Subsequently, on March 23, 2018, the FTC filed a lawsuit against Debtor and Mr. Gotra in the District Court seeking injunctive relief and civil penalties for alleged violations of laws and regulations the FTC enforces, including the Telemarketing Sales Rule and Fair Credit Reporting Act (the "Lawsuit"). In addition, the FTC also filed a Motion for a Preliminary Injunction (the "Injunction Motion") seeking, *inter alia*, an immediate ban on telemarketing activity by Debtor.

18.   Debtor filed its Answer to the Complaint, Joint Motion for Enlargement of Time to Respond to Plaintiff's Injunction Motion and Memorandum in Support ("Motion to Enlarge"), and a Motion to Change Venue to the United States District Court for the District of Rhode Island. On June 8, 2018, the parties filed their Joint Discovery Plan and Scheduling Conference Report. The Injunction Motion, Motion to Enlarge and Motion to Change Venue are currently pending before the District Court.

*Relevant Procedural History*

19.   On July 30, 2018, the Debtor filed its first proposed Disclosure Statement and proposed Plan of Reorganization (the "Proposed Plan").

20.   On October 4, 2018, the Debtor filed its First Amended Disclosure Statement and proposed Plan of Reorganization (the "Amended Plan").

21.   Both Debtor's Proposed Plan and Amended Proposed Plan provided the Debtor to continue its operations post-confirmation and fund the payments under the Proposed Plan and Amended Proposed Plan through Debtor's continued operations.

22.   On September 19, 2018, the FTC filed its Motion to Dismiss or Convert Chapter 11 Case (Doc. No. 595, the "Motion to Dismiss").

23.   On October 18, 2018, the United State Trustee (the "Trustee") filed its Motion to Convert Chapter 11 Case to Chapter 7 (Doc. No. 663, the "Motion to Convert"). Both the Motion to

Dismiss and the Motion to Convert allege that, *inter alia*, Debtor has suffered a substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation.

24. However, Debtor subsequently determined that a sale of substantially all of Debtor's assets and business operations, rather than Debtor continuing its business operations with the uncertainty of the FTC litigation and other litigation pending against Debtor, would be in the best interest of the Debtor's bankruptcy estate, and realize the best value for Debtor's assets.

## THE PROPOSED SALE TERMS

25. Debtor began negotiations with several interested parties to obtain a stalking horse for the Debtor's Assets in its attempt to formulate a plan to pay its creditors.

26. As a result of these efforts, the Debtor has negotiated and entered into a Letter Of Intent ("LOI") with an entity affiliated with Security Systems, Inc. ("Buyer"). The LOI will be supplemented by a formal Purchase and Sale Agreement shortly.

27. Buyer proposes to acquire substantially all of the Assets of the Debtor, except those assets specially excluded in a Purchase and Sale Agreement (the "Assets"), which excluded assets shall include but are not limited to Debtor's cash-on-hand, and any bankruptcy or non-bankruptcy claims or causes-of-action of Debtor (the "Excluded Assets").

28. The purchase price shall be an amount between Five Hundred Thousand Dollars ($500,000) and One Million Dollars, plus the acquisition of Seller's accounts payable up to $300,000. The final Purchase Price shall be determined based on the average amount of alarm accounts installed per week by Seller in the ninety day (90) following the execution of the LOI, as set forth below:

>                230 installs per week: $500,000
>                270 installs per week: $750,000
>                311 installs per week: $1,000,000

29.     The sale of Debtor's Assets to Buyer is subject to higher or better offers, and the approval of this Court, after notice to all interested parties and hearing as determined by the Court, authorizing and ordering the sale of the Assets free and clear of all liens, security interests, claims, encumbrances and interest, including any claims related to the FTC Lawsuit.

30.     Buyer's offer includes a deposit Fifty Thousand Dollars ($50,000) (the "Initial Deposit") into be held in escrow by Debtor's counsel. Twenty-Five Thousand Dollars $25,000 of the Initial Deposit shall be nonrefundable (the "Nonrefundable Deposit") in the event the Buyer does not close on the sale of the Assets, unless the Assets are sold to another buyer for an amount in excess of Seven Hundred Fifty Thousand Dollars ($750,000).

31.     Under the LOI, Buyer has ninety (90) days from the execution of the LOI (the "Due Diligence Period") to complete its review of the Seller's assets, including Seller's leases and executory contracts, in order to determine what assets may be Excluded Assets. The closing would take place on or before the later of the expiration of twenty-two (22) days following: (i) the date of the entry of the Court Order approving sale; or (ii) the Due Diligence Period.

32.     Buyer will pay its own legal and professional fees and other costs and expenses. Buyer will also pay an amount up to $10,000 for the retention and employment of an accountant, financial advisor, or such other professional either appointed by Court or employed by the Committee to determine the value of the Assets sold by Debtor.

33.     Debtor will terminate its business operations upon the closing of the sale of its Assets.

## PROPOSED SALE PROCEDURE

34.     Debtor proposes the following sale procedures in order to provide notice to all

interested parties and maximize potential offers for the Debtor's Assets.

    a. The Court set a hearing on the approval of the sale of Debtor's Assets in approximately sixty days ("Hearing Date"). Debtor proposes a Hearing Date in approximately sixty days in order to provide sufficient time for Debtor to provide notice of the proposed sale to all interested parties, included entities that may have an interest in purchasing Debtor's assets.

    b. The Court establish a deadline of 4:00 p.m. eastern time two days prior to the Hearing Date for parties to submit competing offers for the Assets. In the event there are competing offers for the Assets, the Debtor shall hold and auction for the Assets at the Sale Hearing.

    c. Pursuant to Local Rule 6004-1(c), the Debtor will advertise the proposed sale, deadline to submit higher or better offers, and Hearing Date in the Providence Journal and a trade journal agreed to by the Debtor and the Committee.

    d. In addition to providing notice of the sale to in accordance with Fed. R. Bankr. P. 2002(a)(2) and 6004(c), Debtor will also provide notice of the sale to (i) all entities known to have expressed an interest in purchasing some or all of Debtor's assets in the previous three months; (ii) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon the Assets; (iii) all federal, state, and local regulatory or taxing authorities which have a reasonably known interest in the relief requested by the Motion; (iv) all parties to executory contracts and leases with Debtor; (v) the United States Trustee; (vi) the Rhode Island Division of Taxation; (vii) the Internal Revenue Service; (viii) all parties who have requested notice of all pleadings; and (ix) all parties who have filed Proofs of

Claim.

e. On or before February 28, 2019, the Debtor will file with the Court and serve on each party to an contract to be assumed by Debtor and assigned to Buyer a notice notifying each party that such party's lease or contract will be assumed and assigned to the Buyer ("Assigned Contract") and shall state the cure amount the Debtor believes is necessary to assume such Assigned Contract pursuant to 11 U.S.C. § 365 (the "Cure Amount").

f. The Debtor requests that objections, if any, to the proposed assumption and assignment of Cure Amounts must be filed by 4:00 p.m. eastern time at least two days prior to the Sale Hearing (the "Cure Objection Deadline"), and that any objections must state with specificity the basis therefor and what cure the party to the Assigned Contract believes is required, with appropriate documentation in support thereof. If no objection is timely received, the Cure Notice shall be controlling notwithstanding anything to the contrary in any Assigned Contract or other document, and the non-debtor party to the Assigned Contract shall be forever barred from asserting any other pre-assignment claims based on the Assigned Contract against the Debtor, or the Buyer.

## APPLICABLE LAW

35. By this Motion, the Debtor seeks entry of an order authorizing and approving the Sale to the Buyer and the assignment and assumption the Assigned Contracts, and the Debtor's consummation of the transactions contemplated in the LOI.

36. The Debtor "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the Estate." 11 U.S.C. § 363(b)(1).

37. The Debtor believes that the Proposed Sale Procedures are fair to all parties and are designed to permit the Debtor to obtain the best possible price for its assets. Thus, the Debtor is confident that the successful bid that emerges from this process will truly be the highest and best bid obtainable by the Debtor for the Assets.

38. Accordingly, the Debtor asserts that the Sale is in the best interest of the Estate and all stakeholders because it maximizes the value the Debtor and its creditors will receive for the Assets.

*Sale "Free and Clear" Pursuant to Section 363(f)*

39. Under 11 U.S.C. § 363(f)(2) of the Bankruptcy Code, a trustee or Debtor may sell property free and clear of any lien, claim, or encumbrance if, among other things, the parties holding interests in the property consent or the interest is in bona fide dispute.

40. As noted in previous pleadings, Debtor and the Committee dispute the secured status of Monitronics alleged lien on Debtor's alarm monitoring accounts. In addition, to the extent that any lien, claim or encumbrance that is not the result of an assumed liability or permitted encumbrance satisfies at least one of the five conditions of 11 U.S.C. § 363(f), the Debtor submits that any such lien, claim or encumbrance will be adequately protected by attachment to the net proceeds of the Sale, subject to any claims and defenses the Debtor may possess with respect thereto.

41. Accordingly, the Debtor requests that the Assets be transferred to the Buyer or the free and clear of all liens, claims, and encumbrances (other than liens resulting from assumed liabilities and permitted encumbrances), with such liens, claims and encumbrances, if any, to attach to the net proceeds of the Sale.

## BUYER DISCLOSURES; GOOD FAITH PURSUANT TO SECTION 363(M)

42. 11 U.S.C. § 363(m) provides that: "The reversal or modification on appeal of an authorization under section (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to any entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal." 11 U.S.C. § 363(m).

43. Though the Bankruptcy Code does not define "good faith" circuit courts in other jurisdictions have discussed the requirement that a purchaser act "in good faith" as follows: The requirement that a purchaser act in good faith…speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the Debtor, or an attempt to take grossly unfair advantage of other bidders. *In the Matter of Any Frain Services, Inc.*, 798 F.2d 1113, 1125 (7th Cir. 1986) (emphasis omitted).

44. The Debtor is not aware of any facts that would suggest that Buyer has not at all times acted in good faith.

45. The Debtor asserts that consummation of the sale following the Sale Hearing will be in good faith and at arm's length and that the Successful Bidder is entitled to the protections of 11 U.S.C. §§ 363(m) and 363(n).

## ASSUMPTION AND ASSIGNMENT OF
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

46. As set forth above, to enhance the value of the Sale, the Debtor requests approval under 11 U.S.C. § 365 of the Debtor's assumption and assignment of any Assigned Contracts to the Buyer. The Debtor further requests that the Order approving the sale provide that the Assigned Contracts will be transferred to, and remain in full force and effect for the benefit of the Successful

Bidder notwithstanding any provisions in the Assigned Contracts, including those described in 11 U.S.C. §§ 365(b)(2) and (f)(1) and (3), that purport to prohibit assignments.

47. To accomplish these objectives, the Debtor shall provide non-debtor parties to any Assignment Contracts with a Cure Notice of, and an opportunity to challenge, the prosed assumption and assignment and the proposed cure amounts.

48. 11 U.S.C. § 365(f)(2) provides that a debtor may assign any executory contract or unexpired lease of the debtor if (A) the debtor assumes such contract or lease in accordance with the provisions of this section; and (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease. 11 U.S.C. § 365(f)(2).

49. Adequate assurance may be provided by, *inter alia*, demonstrating the assignee's financial health and experience in managing the type of enterprise assigned. The debtor believes that this requirement is satisfied by the fact that the Buyer is experienced in the home alarm industry.

50. To the extent monetary defaults exist under any executory contract or unexpired lease that is to be assumed and assigned in connection with the Sale, such defaults shall be cured in connection with the sale.

## **CONCLUSION**

WHEREFORE, the Debtor respectfully requests this Court enter and Order approving the proposed sale procedures, and approving the sale of Debtor's assets as set forth herein, and for such other relief that is requested herein and as is just and proper

Respectfully submitted

ALLIANCE SECURITY, INC.
By its attorneys,

/s/ *James G. Atchison*
James G. Atchison, Esq. (#7682)
Atchison Law Office
301 Providence Street
West Warwick, RI 02893
Tel:  (401) 222-9374
james.atchison@gmail.com

Dated: January 29, 2019

    Within twenty-one (21) days after service, if served electronically, as evidenced by the certification, and an additional three (3) days pursuant to Fed. R. Bank. P. 9006(f) if served by mail or other excepted means specified, any party against whom such paper has been served, or any other party who objects to the relief sought, shall serve and file an objection or other appropriate response to said paper with the Bankruptcy Court Clerk's Office, 380 Westminster Street, 6th Floor, Providence, RI 02903, (401) 626-3100. If no objection or other response is timely filed, the paper will be deemed unopposed and will be granted unless: (1) the requested relief is forbidden by law; (2) the requested relief is against public policy; or (3) in the opinion of the Court, the interest of justice requires otherwise.

# **CERTIFICATE OF SERVICE**

I, James G. Atchison, hereby certify that on January 29, 2019, I electronically filed the foregoing Motion with the United States Bankruptcy Court for the District of Rhode Island using the CM/ECF System and that paper copies were sent to those indicated as non-registered participants on that date.

<u>VIA FIRST CLASS MAIL:</u>

BMW Financial Services NA, LLC
c/o Ascension Capital Group
P.O. Box 165028
Irving, TX 75016

Eboney Cobb
Perdue, Brandon, Fielder, Collins & Mott
500 E. Border Street
Suite 640
Arlington, TX 76010

IBM Credit LLC
Peter Brown
Special Handling Group
7100 Highlands Pkwy
Smyrna, GA 30082

Internal Revenue Service Insolvency Unit
4th Floor
380 Westminster Street
Providence, RI 02903

Marie Josee Dube
International Business Mgmt Corp
275 Viger East Montreal
Quebec H2X 347

Office of Unemployment Compensation Tax Srvcs.
Commonwealth of Pennsylvania
Department of Labor and Industry
651 Boas Street Room 702
Harrisburg, PA 17121

RI Division of Taxation
Bankruptcy Unit
Chief Collection Section
One Capitol Hill
Providence, RI 02903

Security Systems, Inc.
1125 Middle Street
Middletown, CT 06457

State of RI - Labor and Training
Legal Department
Bldg 72 3rd Floor
1511 Pontiac Avenue
Cranston, RI 02920

Texas Comptroller of Public Accounts on behalf of
the State of Texas and Local Sales Tax Jurisdictions
Office of Attorney General
Bankruptcy and Collections Division MC00
PO Box 12548
Austin, TX 78711-2548

/s/ *James G. Atchison*